# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

TRUSTEES OF THE SUBURBAN
TEAMSTERS OF NORTHERN
ILLINOIS WELFARE AND PENSION
FUNDS,

      Plaintiffs,

         v.

HOPE CARTAGE, INC., an Illinois
Corporation,

      Defendant.

No.  02 C 8775
Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

In March 1989, John Sinese, owner of Hope Cartage, Inc. ("Hope"), signed a

collective bargaining agreement (CBA) on behalf of Hope with Teamsters Local 179

("Union").  Sinese thereafter extended the CBA four times, through April 2005.

Plaintiffs are the Trustees of the Suburban Teamsters of Northern Illinois Welfare and

Pension Funds (the "Funds").  Plaintiffs first learned of the Hope-Union CBA in

October 2001, shortly after Hope renewed the CBA and a Union employee sent the

Funds a "new employer" package.

In November 2001, Plaintiffs contacted Hope and demanded reports and

contributions for the months of May 2000 through September 2001.  The following

year, Plaintiffs' payroll auditor declared that Hope owed Plaintiffs' Welfare Fund

$23,412.02 and Plaintiffs' Pension Fund $15,904.45 on behalf of Hope's owner and

employee Sinese. When Hope failed to pay, Plaintiffs filed suit seeking an audit and

contributions dating back to 1992. That audit revealed allegedly delinquent payments

for Sinese and owner-drivers to whom Hope subcontracted work. With interest and

other penalties permitted under 29 U.S.C. § 1132(g)(2), the alleged delinquency

presently totals $226,092.16.

Both parties filed cross motions for summary judgment, seeking resolution of

the case without resort to trial. Summary judgment is proper "if the pleadings,

depositions, answers to interrogatories and admissions on file, together with the

affidavits, show that there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. A

genuine issue of material fact exists when, in viewing the record and all reasonable

inferences drawn from it in a light most favorable to the non-movant, a reasonable jury

could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 2488 (1986). The movant bears the burden of establishing that no genuine issue

of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Plaintiffs argue that they are entitled to the full amount of the delinquency for

the following reasons: Sinese signed a CBA, which requires contributions to the Funds;

Sinese is a dual status owner/employee for whom Hope must make contributions

pursuant to *Yates v. Hendon*, 541 U.S. 1 (2004); Hope has no valid defense to non-

payment of the contributions for Sinese; and Hope is required under the terms of the

bargaining agreement to make contributions on behalf of non-union owner-drivers to

2

whom Hope subcontracted work. Hope disputes that any monies are owed under the CBA. It first argues that Plaintiffs cannot seek contributions for the owner of a one-man corporation, notwithstanding the holding in *Yates*. Hope also maintains that it is not responsible for any contributions on behalf of Sinese because Sinese and the Union agreed that Hope would not be required to make contributions to the Funds and because Sinese subsequently waived his rights to any benefits from Plaintiffs. In the alternative, Hope argues that Plaintiffs cannot seek contributions for the period prior to 2001, when Plaintiffs first learned of Hope's CBA with the Union. Finally, Hope argues that any demand for contributions for owner-drivers hired as independent contractors is illegal under Seventh Circuit precedent and conflicts with the express language of the CBA.

### *Sinese's Status as the Sole Owner-Employee*

The Agreements and Declarations of Trust ("Trust Agreements") establishing the Funds are incorporated by reference into the CBA signed by Hope and the Union. The CBA requires weekly pension and welfare contributions to the Funds for all employees covered by the agreement. The Trust Agreements define an employer as any association, individual, partnership or corporation that has a collective bargaining agreement with the union and defines an employee as any person employed by an employer. There is no written side agreement between the Union and Hope regarding the payment of welfare or pension benefits. It is undisputed that Hope never made any contributions for John Sinese, who drives a truck for Hope to haul sand, gravel and other materials and who is Hope's 100% owner.

3

In *Yates*, the Supreme Court held that the sole shareholder and president of a corporation, in his capacity as a working owner, is a participating employee in an ERISA pension plan as long as the plan covers one or more employees other than the owner and his spouse. 541 U.S. at 20-22. That decision abrogated this Circuit's decision in *Giardono v. Jones*, 867 F.2d 409, 412 (7th Cir. 1989) and similar holdings in four other Circuits. *Yates* recognized that under ERISA, a working owner may have dual status as an owner and as an employee entitled to participate in a pension plan. *Id*. at 16 ("a working owner can wear two hats, as an employer and employee"). Plaintiffs allege that Sinese, the sole shareholder and president of Hope, is analogous to the defendant-owner in *Yates*. Plaintiffs argue that *Yates* is binding upon Hope because the relevant ERISA plan covers more than 650 contributing employers and 5,500 participating employees - far more than the "one or more employees" other than the owner and his or her spouse required by *Yates*. *Id*. at 6.

Hope seeks to distinguish Sinese from the defendant in *Yates* by relying on its status as a "one man corporation." (Def. Mem. at 13.) In the Seventh Circuit, a one-person corporation "must use a Keogh plan rather than an ERISA plan for its solitary employee." *In re Baker*, 114 F.3d 636, 639 (7th Cir. 1997). As the *Yates* decision did not address owners who were also the corporation's sole employee, Hope argues that *Yates* applies only to owners of companies employing other individuals. Hope contends that *Baker* is still good law post-*Yates*, and that owners of corporations

4

employing only the owner cannot be required to contribute to traditional pension plans but must establish Keogh plans instead.

*Yates* arose from a bankruptcy proceeding against a debtor's pension plan. 541 U.S. at 7-9. The bankruptcy trustee sought to recover funds paid into the pension plan by the debtor, who was the president and sole shareholder of the corporation. *Id*. The trustee argued that under ERISA, the debtor could not participate in the plan and that the money should be turned over to creditors. *Id*. The court rejected this argument and classified the debtor as an eligible participant in the ERISA plan, thereby allowing him to retain his pension. *Id*. at 16.

The pension plan at issue in *Yates* was not a multi-employer plan like the one in the instant case, but one in which the "one or more" other employees contemplated by the Court's ruling were actually employed by the business owner. Plaintiffs place little weight on this factual difference, and with good cause. Sinese, on behalf of Cartage, freely entered into a CBA with the Union that required contribution to ERISA-governed funds. Notwithstanding Sinese's right to establish a Keogh plan as indicated by *Baker*, he signed a contract on behalf of his corporation agreeing to participate in an ERISA-governed plan. *Yates* clearly establishes that Sinese's status as the company's owner and sole shareholder does not prohibit his participation in that plan.[1] I find that

---

[1]In *Yates*, the Supreme Court observed that "[p]lans that cover only sole owners or partners and their spouses, the [department of labor's] regulation instructs, fall outside Title I's [of ERISA] domain." 541 U.S. at 21. However, the plan at issue in this litigation covers hundreds of employers and thousands of employees; it is not

Sinese's status as both the owner and sole employee of Hope is not a defense to the Funds' pursuit of contributions.[2]

### Sinese's Alleged Waiver of Participation in the Funds

Sinese entered into the CBA in order to secure contracts available only to union employers. It is also uncontested that Sinese was Hope's sole driver during the period in dispute (setting aside, for the moment, the issue of the subcontractors Hope hired for its overflow work). Sinese alleges that when he signed the CBA he simultaneously entered into an oral agreement with Union representative Robert White. According to Sinese, the oral agreement permitted Hope to avoid any contribution to the Funds. Hope seeks summary judgment of Plaintiffs' claim for contributions on the grounds that Sinese knowingly and voluntarily waived all benefits Plaintiffs may have provided to him under the trust agreements. Hope argues that it cannot be liable for contributions if Sinese waived Hope's obligation to pay and his own right to receive any benefits in return.

Relying on cases establishing that employees are entitled to waive their participation in ERISA plans, Hope argues that Sinese was entitled to waive his participation in the Funds so long as the waiver was knowing and voluntary. *See, e.g.,*

_____

outside of Title I's scope.

[2] *Cf. Moriarty v. Korkis*, No. 02 C 2861, 2004 U.S. Dist. LEXIS 19671, at *4 (N.D. Ill. Sept. 30, 2004) (noting that after the *Yates* ruling, the defendant withdrew his argument that president and sole shareholder of the corporation could not participate in an ERISA plan).

*Sharkey v. Ultramar Energy*, 70 F.3d 226, 231 (2d Cir. 1995) (observing that individuals may waive their right to participate in pension benefit plans when, "in the totality of the circumstances, the individual's waiver of his right can be characterized as 'knowing and voluntary'") (quoting *Laniok v. Advisory Committee of Brainerd Mfg. Co. Pension Plan*, 935 F.2d 1360, 1368 (2d Cir. 1991)).

Plaintiffs argue that whether or not Sinese and the Union verbally agreed that Hope would not be required to make contributions to the Funds (a fact the Funds and Robert White vehemently deny), they are not bound by any such agreement. *Central States, Southeast & Southwest Areas Pension Fund v. Gerber Truck Serv., Inc.*, 870 F.2d 1148, 1149 n.1 (7th Cir. 1989) (en banc) (citations omitted) established that bargaining history is "irrelevant" and the discovery of such information is unavailable when fund trustees seek to enforce the terms of a collective bargaining agreement. Funds are entitled to enforce collective bargaining agreements according to their terms and without regard to the understandings or defenses applicable to the original parties to the agreement. *Id*. at 1149. These defenses include fraud and oral side agreements. *Id*. at 1154. *See also Central States, Southeast & Southwest Areas Pension Fund v. Joe McClelland, Inc.*, 23 F.3d 1256, 1257-58 (7th Cir. 1994) ("[n]o matter what an employer and local union agree orally, the collective bargaining and contribution agreements establish the employer's obligation to the pension fund, which is not party to local understandings and limitations . . . as a matter of law the [local] understanding is irrelevant").

The *Gerber* Court, however, based its decision on the premise that the plaintiff

funds relied on the terms of the written agreement. *Id*. at 1151 ("[p]lans rely on

documents to determine the income they can expect to receive, which governs their

determination of levels of benefits"). In this case, Plaintiffs did not have notice of the

written agreement between Hope and the Union until 11 years after its formation, and

Hope's employee[s] did not figure into Plaintiffs actuarial computations prior to

October 2001. Hope claims that to award any contributions to Plaintiffs for the period

prior to October 2001 would provide Plaintiffs with a pure windfall, free of any

corresponding obligation to provide benefits to Sinese. (Def. Mem. in Opposition, at 7-

8.)

Nonetheless, there is a persuasive argument for holding Hope (and the Union) to

the terms of the written contract. "*Gerber* does not indicate that the pension fund must

be 'hurt' to recoup contributions under its collective bargaining agreement. Rather,

*Gerber* emphasizes the national policy of requiring employers to fulfill their pension

agreements, which in turn, minimizes administrative problems, litigation costs, and

adverse selection." *Central States, Southeast and Southwest Areas Pension Fund v.

Tank Transport, Inc.*, No. 90 C 5524, 1993 WL 369331, at *8 (N.D. Ill. Sept. 17, 1993)

(citation omitted). The facts surrounding Sinese's alleged oral agreement to avoid

contributions to the funds are disputed.[3] What is not disputed is the fact that Sinese and

---

[3]Robert White denies agreeing to any scheme in which Hope would not be
required to make all of the contributions required by the CBA.

the Union signed a CBA requiring Hope to contribute to the Health and Welfare Funds

on behalf of each regular employee covered by the agreement and to contribute to the

Pension fund for each regular employee who worked two calendar days in any calendar

week. Sinese admits that he was never told, by Plaintiffs, that contributions were not

required. That the Union failed to forward a copy of the CBA to Plaintiffs prior to

October 2001 does not alter the overriding principle that employers have an obligation

to fulfill the promises they make in collective bargaining agreements. While Hope may

assert other defenses to Plaintiffs' effort to collect contributions for the entire statutory

period, Sinese's purported oral agreement waiving his obligation to make contributions

carries no weight.[4]  To hold otherwise would ignore the plain language of the CBA.

---

[4]I also find unpersuasive Hope's defense to collection of contributions based on
Sinese's 2005 effort to waive unilaterally his entitlement to any benefits from Plaintiffs.
In support of this defense, Hope again relies on cases establishing the right of
individuals to waive their entitlement to participate in single-employer pension plans.
*See, e.g., Laniok v. Advisory Committee of Brainerd Mfg. Co. Pension Plan*, 935 F.2d
1360 (2d Cir. 1991). Those cases were brought under 29 U.S.C. § 1132(a)(1)(B) by
plaintiffs asserting claims for benefits; the defendants argued that the claims were
barred by bargained-for releases (waivers) made knowingly and voluntarily. *See id*. In
the instant case, an employer is attempting to avoid an action filed by the Plans under
29 U.S.C. § 1145 on the basis of the owner-employee's post-facto, unilateral offer to
amend the terms of the CBA. The cases cited by Hope do not bear upon the outcome
of this dispute. Hope's argument that Sinese was entitled to waive unilaterally any
obligation to or entitlement from Plaintiffs (eleven years after signing the CBA)
because the trust documents do not explicitly forbid waivers is similarly unavailing.

***Plaintiffs' Right to Contributions Falling within the Statute of Limitations Period***

Finally, Hope seeks to avoid contributions for the period preceding October

2001, when Plaintiffs learned of the CBA, on the basis of two clauses within the

Welfare and Pension Trust Agreements.  One such clause states:

> The Trustees are authorized to extend the coverage of this
> Restated Agreement and Declaration of Trust to *such other*
> *Employers as the Trustees shall agree upon*, provided such
> Employers are required and agree to conform to the terms
> and conditions hereof and to make Employer Contributions
> pursuant to a Collective Bargaining Agreement with a
> Union.

(Joint Ex. 10, § 3.20) (emphasis added).[5]  As Hope construes those provisions, it was

not bound to the Trust Agreement until Plaintiffs actively exercised their powers under

Section 3.20, *i.e.*, until Plaintiffs "agreed" to extend coverage to Hope.  Hope reasons

that because Plaintiffs were unaware of the CBA prior to October 2001, they could not

have agreed to extend coverage to Hope before that time and are not entitled to benefits

for that period.

Plaintiffs' only response to this argument is to rely on the provisions of the

CBA.

> The Employer shall contribute into a trust set up by trust
> agreements now in effect in the aforementioned Local
> Unions for the payment of Health and Welfare or Pension
> benefits, as the case may be, as determined by the

---

[5]The other provision states, in relevant part, "nothing herein shall require the
Trustees to extend the coverage of this Restated Trust Agreement to every Employer
which is a party to a Collective Bargaining Agreement with the Union or, having
excluded such coverage, to continue to do so."  (Joint Ex. 11, Art. III, § 3.18.)

> appropriate Board of Trustees, the amounts shown . . .
> below per week for an employee covered by this
> Agreement, in accordance with the requirements set forth
> in the appropriate Appendix of this Article.

(Joint Ex. 9, Art. 16, § 16.1) Hope admits that the CBA states that the Employer "shall contribute contributions to the Health and Welfare Funds as set forth in Article 16 . . . on behalf of each regular employee covered by the Agreement" and that the CBA requires "each Employer to pay into the Pension Fund the amount for each stated in Article 16 . . . as of the appropriate date stated therein for each regular employee covered by this Agreement who performs work on two calendar days and any calendar week. (Def.'s S.M.F., ¶¶ 51, 52.)

Hope's suggestion that it was not obligated to make contributions until Plaintiffs agreed to extend benefits is inconsistent with its admission that Article 16 of the CBA mandated contributions to the Funds by employers. Moreover, if Hope's obligation was not triggered until Plaintiffs' "agreement," Sinese's purported oral side agreement with the union would have been meaningless. Considering both the CBA and the Trust Agreements in their entirety, I could not be persuaded that Plaintiffs were required to take any affirmative steps before Hope was obligated to make contributions.

For these reasons, I find that Hope was obligated under the plain language of the CBA to make contributions on behalf of employee-owner Sinese for the entire period of the CBA (within the applicable statute of limitations) and that Sinese offers no valid

defense for his failure to make contributions.  Plaintiffs' motion for summary judgment in the amount of $184,169.82 is granted.[6]

### *Contributions for Subcontractors*

Pursuant to Article 24 of the CBA, Plaintiffs also seek contributions for several owner-drivers to whom Hope subcontracted work.  Alternatively, Plaintiffs argue that Hope breached Article 17 of the CBA by subcontracting work when it employed less than two individuals and claim they are entitled to damages to compensate them for the losses sustained by this breach.  Hope contends that the owner-drivers were independent contractors for whom no contributions were required and for whom contributions would be illegal under ERISA and the LMRA.

Section 515 of ERISA "requires employers to comply with the terms of their agreements to make contributions to funds," *Central States, Southeast & Southwest Areas Pension Fund v. Transport, Inc.*, 183 F.3d 623, 627 (7th Cir. 1999) (citation omitted), to the extent that such terms are not inconsistent with the law.  *See Central States, Southeast & Southwest Areas Pension Fund v. Hartlage Truck Serv., Inc.*, 991 F.2d 1357, 1360 (7th Cir. 1993).  Section 302 of the LMRA prohibits an employer from contributing to a trust fund "on behalf of, or for the benefit of, anyone ineligible to receive benefits from those funds." *Illinois Conference of Teamsters & Employers Welfare Fund v. Mrowicki*, 44 F.3d 451, 460 (7th Cir. 1994) (citations omitted).

---

[6]Hope did not raise any objections to the calculations used to reach this figure.

Nonetheless, a collective bargaining agreement may require employees to make

contributions to funds based on the hours worked by non-employee subcontractors

without violating Section 302. *Walsh v. Schlecht*, 429 U.S. 401, 405, 410 (1977).

"[A]lthough an employer would violate section 302 by permitting subcontractors to

participate in the trust fund benefits, the employer would not violate section 302 by

making contributions to the trust funds measured by the hours worked by these

subcontractors, so long as only employees participated in these benefits." *Chicago

Painters & Decorators Pension v. Karr Bros., Inc.*, 755 F.2d 1285, 1289-90 (7th Cir.

1985) (citing *Walsh*, 429 U.S. at 410).

I must first consider whether the CBA required Hope to contribute to the funds

on behalf of the owner-drivers to whom it subcontracted work; if I find this to be the

case, I must determine if the contributions called for in the CBA were permissible.

*Mazzei v. Rock-N-Around Trucking, Inc.*, 246 F.3d 956, 960, 961 (7th Cir. 2001)

(citations omitted); *see also Mrowicki*, 44 F.3d at 458, 460. The following provisions

of the CBA are relative to this analysis.

> Article 16: Health and Welfare and Pension
> 16.1. The Employer shall contribute into a trust set up by
> trust agreements now in effect . . . for the payment of
> Health and Welfare or Pension benefits . . . the amounts
> shown in 16.2 below per week for an employee covered by
> this agreement.
> Appendix A: Health and Welfare
> A.1. Each Employer shall pay the amount per week stated
> in Article 16 . . . as of the appropriate date stated therein
> for each regular employee covered by this Agreement who

performs any work in such week into a trust fund . . . for the payment of Health and Welfare benefits.

Appendix B: Pension

<u>B.2-1</u>.  Each Employer shall pay into the Pension Fund the amount per week stated in Article 16 . . . as of the appropriate date stated therein for each regular employee covered by this agreement who performs work on any two (2) calendar days in any calendar week.

Article 17: Work Preservation and Protection of Standards

<u>17.1</u>.  For the purpose of preserving work and job opportunities for employees covered by this Agreement . . . the Employer agrees that no operation, work or services of the kind, nature or type covered by, or presently performed, by the Employer will be subcontracted, transferred, diverted or assigned in full or in part . . . by the Employer . . . unless specifically provided or permitted in this agreement.

<u>17.2</u>. The term "overflow work" as provided herein, is defined as any work in excess of work performed by the average number of employees covered by this Agreement . . . but, in no event, less than two employees.  The Employer may subcontract work when all of its regular employees are fully employed.  Overflow work may be performed by persons other than the Employer's employees, provided that such subcontracting is not used as a subterfuge to evade the provisions of this agreement, and is done in accordance with this Article.  Owner-operators or other persons performing overflow work shall be paid no less than an amount equal to the wages and fringe benefits being paid to employees covered by this Agreement exclusive of truck rental and lease cost.

Article 24: Owner-Drivers

<u>24.1</u>. Owner-drivers operating their own vehicles and who are not certified carriers with proper Illinois Commerce Commission authority are covered within the terms and conditions of this Agreement, including Union security, hours, wages, overtime, Health and Welfare and Pension and working conditions . . .

<u>24.1-3</u>.  The Employer reserves the right to control the manner, means and details of and by which such Owner-

Driver performs his services, as well as the ends to be
accomplished.

24.1-4. Such Owner-Driver shall receive the full wages,
supplemental allowances, and all working conditions
provided in this Agreement and shall receive as a minimum
salary after payment of all direct and indirect operating
expenses (including contributions to the Health and
Welfare and Pension Fund) the sum equal to the amount he
would have received for the time he would have worked as
an hourly rated driver.

24.1-6. In no event shall such Owner-Driver's wages be
paid on a percentage basis.

(Joint Ex. 9.) Under the contract's clear language, Hope was obligated to treat owner-

drivers doing work covered by the CBA as if they were employees and were required to

make contributions to the Health and Welfare and Pension funds unless the owner-

drivers fell under Article 17's subcontracting provision.[7] (Joint. Ex. 9, Art. 24.) *Cf.*

*Mrowicki*, 44 F.3d at 458 (finding that the "plain meaning" of similar contractual

language required that "all individuals who owned and operated single trucks and who

were engaged to perform services covered by the CBAs were, unless they were 'used

as subcontractors' . . . to be carried on their employers' payrolls and be regarded as

'employees' covered by all the terms and conditions of the CBAs"). I turn next to the

legality of these provisions.

---

[7]Throughout its briefs Hope refers to its owner-drivers as subcontractors, but its
argument with respect to the legality of the contributions required by the CBA turns on
Articles 16 and 24, so I assume for this argument that Hope considers its owner-drivers
independent contractors falling within Article 24. I address later Hope's alternative
argument that the owner-drivers were true subcontractors within the meaning of Article
17.

In *Mazzei*, the Seventh Circuit considered a contract similar to the one at issue in this case, with clauses almost identical to Article 16 (Contributions to Health and Welfare and Pension Funds) and Article 24 (Owner-drivers). 246 F.3d at 960. Reviewing the contract, the Court held that "there can be no mistaking the fact that the CBA attempts to impose an obligation on [the defendant employer] to contribute to the Funds for each of its owner-drivers." *Id*. at 960-61. Like the CBA in this case, the CBA in *Mazzei* required contributions to the Health and Welfare Fund for each employee covered by the agreement, though the exact language of the CBA differed. *See id*. at 962 (observing that the CBA required contributions "for each employee . . . who performs work on any two calendar days in any calendar week, *regardless of the number of hours worked*") (emphasis in original).[8] As the *Mazzei* Court noted, "[t]he measure of these contributions has no relation to the number of hours these individuals actually work." *Id*.

*Mazzei* distinguished this requirement from the contributions upheld in *Walsh*, concluding that *Walsh* only permitted contributions (regardless of the employment status of the employer's workers) when the amounts of the contributions were measured by the number of hours worked. *Id*. at 962. Since the agreement at issue in *Mazzei* did not base contributions on the number of hours worked, the Court concluded that "the employment status of [the employer's] owner-drivers will determine the

---

[8]A similar provision governed contributions to the pension fund. *Id*.

16

legality of the contributions under the LMRA." *Id*. In other words, *Walsh* was

inapplicable and common law principles governing the status of independent

contractors determine whether the required contributions were permissible. *Id*. at 962-

63. As the contract language in this case is nearly identical to the language at issue in

*Mazzei*, I must apply the same analysis. Therefore, I turn to common law agency

principles to determine the employment status of Hope's owner-drivers and whether the

CBA mandates impermissible contributions.[9]

The Supreme Court has adopted a "common-law test for determining who

qualifies as an 'employee' under ERISA." *Nationwide Mut. Ins. Co. v. Darden*, 503

U.S. 318, 323 (1992). Whether Hope's owner-drivers are employees or independent

contractors turns on a multi-part test in which "the employer's right to control is the

most important [factor]." *EEOC v. North Knox Sch. Corp.*, 154 F.3d 744, 747 (7th Cir.

1998) (internal quotation and citation omitted). The other factors include:

> [t]he kind of occupation and nature of skill required,
> including whether skills are obtained in the workplace, [ ]
> responsibility for the costs of operation, such as equipment,
> supplies, fees, licenses, workplace, and maintenance of

---

[9]The CBA in this case does not contain the words "regardless of the number of hours worked." *Cf. Mazzei* at 962. Nevertheless, those words are not necessary for me to reach the same outcome. The plain language of Hope's CBA establishes that the contributions outlined in Section 16.2-1 (Health and Welfare) and 16.2-2 (Pension) do not depend on the number of hours worked. Rather, the CBA requires contributions at fixed, weekly amounts so long as any regular employee performs "any work in such week" (Health and Welfare) or performs "work on any two (2) calendar days in any calendar week." (Joint Ex. 9, Art. 16, App. A, B.)

> operations, [ ] method and form of payment and benefits,
> and [ ] length of job commitment and/or expectations.

*Mazzei*, 246 F.3d at 963 (quoting *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 378-79 (7th Cir. 1991)).

Hope's owner-drivers owned their own trucks, worked for other employers, were responsible for the costs of storage, maintenance, gas, and insurance on the trucks, and could refuse work assignments from Hope without penalty. Under the Seventh Circuit's test, Hope's owner-drivers are quite clearly independent contractors. *See Mazzei*, 246 F.3d at 964 (employer's similar degree of control over owner-drivers amounted to little more than a "basic level of supervision," owner-driver's use of own trucks and ability to refuse work further demonstrated minimal control by employer, and owner-driver's payment of storage, maintenance, gas and insurance are "strong indication" that drivers were independent contractors) (internal quotations and citation omitted). Employers cannot be required to contribute to welfare and pension funds for owner-drivers who are independent contractors when the contributions are not measured by the hours worked by the independent contractors. *Mazzei*, 246 F.3d at 965. Therefore, I must deny Plaintiffs' motion for summary judgment, as the contributions called for in the CBA violate the LMRA. *Cf. Mrowicki*, 44 F.3d at 461 (contributions based on hours worked by independent contractors did not violate LMRA and could be enforced under ERISA).

There remains, however, the issue of whether Plaintiffs are entitled to damages based on Hope's breach of the CBA. Plaintiffs argue that Hope breached the CBA when it hired sub-contractors in violation of Article 17.2, which required Hope to employ at least two employees before subcontracting work, and when it paid those subcontractors on a percentage basis, which is prohibited under Article 24.1-6. Article 17, entitled "Work Preservation and Protection of Standards," is a subcontracting clause defining the conditions in which a signator employer can subcontract bargaining unit work. It protects the bargaining unit from an employer's efforts to receive indirectly cheaper labor than called for under the terms of the contract. Faced with overflow work, Hope subcontracted with owner-drivers rather than hire additional employees, whom Hope would have been required to pay on an hourly, rather than a per-ton, basis and for whom Hope would have been required to extend other union benefits, including contributions to the Funds. Plaintiffs are entitled to damages for Hope's breach of contract. The appropriate measure of those damages are the contributions Hope would have made had it hired additional employees rather than hiring subcontractors in violation of the CBA.

Hope relies on *Woldman v. County Line Cartage Inc.*, No. 01 C 9414, 2003 WL 22995161 (N.D. Ill. Dec. 16, 2003) for the proposition that it should not be held liable for contributions despite any breach. In *Woldman*, Judge Hibbler denied the plaintiff funds' demand for contributions despite the employer's breach of contract by hiring

subcontractors. Had the employer properly hired subcontractors, the plaintiff funds still would not have received any contributions because the CBA did not require contributions for properly hired and compensated subcontractors. In this case, the CBA prohibited Hope, a corporation with fewer than two employees, from hiring subcontractors. (Joint Ex. 11, Art. 17.) By improperly subcontracting overflow work to owner-drivers, Hope breached the contract in a manner that imposed costs (in the form of lost contributions for employees Hope was required to hire before subcontracting work) on Plaintiffs and they are entitled to damages to compensate them for those losses. *See Karr Bros.*, 755 F.2d at 1290 ("the district court correctly required defendant to pay plaintiffs the amount that defendant would have been required to contribute to the trust funds if it had complied with the collective bargaining agreements and hired employees to do bargaining unit work").

For this reason, I grant Plaintiffs' motion for summary judgment in the amount of $22,619.00 based upon Hope's impermissible subcontracting of work to owner-drivers Maves Trucking, K&N Trucking, Larry Fultz, David Steffes, Mike Nelson and Terry Jacobsen.

### *Conclusion*

Plaintiffs are entitled to summary judgment against Hope Cartage, Inc., for the audit period January 1, 1992 through December 31, 2002 in the amounts of $184,169.82 for unpaid contributions on John Sinese, interest on those contributions

and the higher of interest or liquidated damages pursuant, to 1132(g)(2)(A) - (C).

Plaintiffs are also entitled to summary judgment on Plaintiffs' claims for contributions

based upon owner-drivers hired by Hope during the same period in the amount of

$22,619.00 for unpaid contributions pursuant to principles of contract law. Plaintiffs'

Motion to Strike Portions of Hope Cartage, Inc.'s Motion for Summary Judgment is

denied as moot.

ENTER:

_James B. Zagel_

_____

James B. Zagel
United States District Judge

DATE: November 15, 2005